## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EARLY WARNING SERVICES, LLC** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  21-1050** |
| | : | |
| **WILLIAM GRECIA and GRECIA** | : | |
| **ESTATE HOLDINGS LLC** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                  **August 6, 2021**

A company providing digital payment services for banks asks us to declare its product and services do not infringe a patent held by a Pennsylvania citizen and to invalidate the patent in issue. The service provider earlier agreed to indemnify one of its bank customers accused of infringing the patent in issue in a first-filed case before Judge Albright in Texas. We denied the patent holder's first pro se motion to dismiss which then argued the first-filed rule and compulsory counterclaim. The patent holder pro se filed an answer and did not ask us to declare the service provider infringes his patent. He instead brought his longtime counsel into this case who promptly moved to dismiss for lack of subject matter jurisdiction arguing we lack a case or controversy because a patent holder has no claim whatsoever against the services provider relating to the patent in issue. The patent holder's counsel repeatedly represented the services provider is not infringing the patent in issue in any way during oral argument. The patent holder's lawyer went so far as to say analysis of the infringement does not implicate any of the provided services and did not deny the same analysis applies to the service provider's products. The patent holder further conceded he is precluded from alleging direct or indirect infringement against the service provider or any of its customers for the use of its services or products. We rely upon these admissions and, as informed by our Court of Appeals for the Federal Circuit's analysis, find a case or controversy but

not before us in this case; it is one already before Judge Albright under the service provider's indemnity obligations to a customer. We grant the patent holder's motion to dismiss mindful the service provider preserved the opportunity to raise arguments surviving after the patent holder's unambiguous repeated admissions before us.

## I.    Facts

Patent holder William Grecia of Pennsylvania and Early Warning Services, owner of the Zelle® digital payment services network featured by banks, have spent years on opposite sides of various patent battles – Mr. Grecia as the patentee and Early Warning as an indemnitor of various bank customers.[1]

The latest chapter in the Grecia-Zelle® saga began when Mr. Grecia emailed his counsel, Matt Wawryzn, on December 23, 2020, saying he planned to bring four patent infringement cases in 2021 in the United States District Court for the Western District of Texas and attaching four claim charts outlining his infringement contentions.[2] He instructed his counsel to inform Early Warning of his intent to sue and offer Early Warning the opportunity to settle the cases for its bank customers "as the indemnifying party."[3] Mr. Grecia gave Early Warning until January 5, 2021 to offer him a settlement before he sued.[4] Mr. Grecia asked Attorney Wawryzn to send the claim charts to George Chen – an attorney who represents Early Warning.[5]

The third claim chart attached to Mr. Grecia's email accused Early Warning's customer Frost Bank of infringing Claim 23 of Mr. Grecia's '555 Patent.[6] The chart contained three columns.[7] In the far left column, Mr. Grecia transcribed the relevant language from Claim 23 of the '555 Patent.[8] In the middle column, Mr. Grecia described the Frost Bank mobile application and its overlap with the '555 Patent.[9] In the far right column, Mr. Grecia provided screenshots of the evidence giving rise to his claim.[10] Mr. Grecia mentioned Zelle® several times in both the

second and third columns.[11] In the third column, where he offers evidence of infringement, Mr. Grecia primarily relied on screenshots from Frost Bank's website and screenshots from IBM support services.[12]

### *Mr. Grecia sues Frost Bank in Texas.*

After two weeks passed without a response from Early Waning, Mr. Grecia filed a lawsuit against Frost Bank on January 8, 2021.[13] Unlike in his email demand where he accused Frost Bank of infringing Claim 23 of the '555 Patent, Mr. Grecia accused Frost Bank of infringing Claim 16 of the '555 Patent. He attached a claim chart to his Complaint like the one attached to his email demand. Mr. Grecia again mentioned Zelle® several times but relied primarily on screenshots from Frost Bank's website and IBM support services.[14]

Early Warning agreed to defend and indemnify Frost Bank in the Texas action.[15] It has not yet answered the complaint and reserved the right to file counterclaims against Mr. Grecia.

### *Early Warning brings a declaratory judgment action in this District.*

Early Warning filed a declaratory judgment action in this Court almost two months later asking us to declare all claims of Mr. Grecia's '555 Patent invalid, or alternatively, declare Early Warning does not infringe the '555 Patent.[16] In the early stages of this litigation, Mr. Grecia represented himself pro se. Mr. Grecia pro se moved to dismiss this action in favor of his pending Texas action under the first-filed doctrine and the compulsory counterclaim rule.[17] Early Warning opposed, arguing the customer-suit exception counseled in favor of our presiding over the declaratory judgment action.[18] We agreed with Early Warning and denied Mr. Grecia's motion.[19] Mr. Grecia then pro se filed an answer along with a counterclaim based on his understanding of a release signed an Early Warning customer. We granted Early Warning's motion to dismiss the counterclaim.[20]

Mr. Grecia then quickly brought Attorney Wawryzn into this case. His counsel moved to dismiss this declaratory judgment action for lack of subject matter jurisdiction, citing the United States Court of Appeals for the Federal Circuit's decision in *Microsoft v. DataTern* for the first time.[21] Our review of Mr. Grecia's motion and *Microsoft* raised questions not only regarding our subject matter jurisdiction, but also whether this case belongs here in light of Early Warning's confirmed indemnification obligations to its customer Frost Bank in Texas. We scheduled oral argument and asked Early Warning to address, in addition to the merits of Mr. Grecia's subject matter jurisdiction argument, whether this case belongs here in light of *Microsoft*.[22]

During oral argument, we discussed, among other things, the claims Mr. Grecia has or believes he has, against Early Warning directly. Attorney Wawryzn repeatedly represented Mr. Grecia has no claim against Early Warning for direct or indirect infringement.[23] He represented Mr. Grecia has not counterclaimed in this case for direct or indirect infringement and would not do so.

He went further to avoid confusion and represented "Early Warning . . . does not provide any services that bear on the infringement analysis . . . Early Warning should have comfort that, as far as patent infringement goes, it or its purported customers have nothing to worry about, because everything Mr. Grecia has in his patent portfolio would be directed towards entities with Applications that perhaps use components provided by parties like IBM, not Early Warning Services; provided by perhaps parties like Fiserv, not Early Warning Services."[24]

We asked whether Mr. Grecia's position applied only to Claim 16 of the '555 Patent, and Mr. Grecia responded, "No, I think it's broad to all '555 Patent Claims. It's [Mr. Grecia's] view that [he] has no direct or indirect patent infringement claims against Early Warning . . . because . . . an analysis of infringement does not implicate any services that Early Warning provides."[25]

4

We asked whether Mr. Grecia's position on Early Warning's non-infringement extends to "use of Early Warning's products", and Mr. Grecia's counsel said, "well, you can say it however you want to say it. But there are no Early Warning services that implicate the infringement analysis."[26] He later again stated, "we believe we're precluded from . . .  making any allegation of direct or indirect infringement against Early Warning or any Early Warning customer that consumes Early Warning services."[27]

## II.    Analysis

We now address Mr. Grecia's motion to dismiss for lack of subject matter jurisdiction.  Mr. Grecia argues we lack subject matter jurisdiction over Early Warning's declaratory judgment request claims because there is no case and controversy between the parties based on *Microsoft v. DataTern*. Mr. Grecia argues his claim charts rely on third party documents, and he does not accuse Early Warning of infringement – direct, indirect, contributory, or otherwise. Mr. Grecia also argues if we find jurisdiction, we should limit our review to Claim 16 or at most Claim 23 and Claim 16. Early Warning opposes, arguing the totality of the circumstances establish a case and controversy between the parties. Early Warning points to Mr. Grecia's many accusations related to Early Warning or Zelle®, his litigiousness, his threats against Early Warning, and his refusal to provide Early Warning with a covenant not to sue. Having reviewed the submissions of the parties and considered their oral arguments, we find a case or controversy exists between Mr. Grecia and Early Warning as an indemnitor of its customers. But we do not find a case or controversy between Mr. Grecia and Early Warning regarding Early Warning's liability for infringement. We must dismiss this case under *Microsoft*, finding Early Warning will continue with Mr. Grecia but as an indemnitor in the Texas action and given Mr. Grecia's admission nothing in the Frost Bank suit involves Early Warning.

"A party has standing to bring an action under the Declaratory Judgment Act if an 'actual controversy' exists" under Article III of the Constitution.[28] "The burden is on the party claiming declaratory judgment jurisdiction to establish that an Article III case or controversy existed at the time the claim for declaratory relief was filed."[29] "The threshold question for declaratory judgment jurisdiction is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"[30] "[W]here a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action *if* . . . there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers."[31] If Mr. Grecia's "charges of infringement against" Frost Bank carry an "implied assertion" Early Warning committed "contributory infringement," and Mr. Grecia "repeatedly communicated this implicit accusation directly to" Early Warning "during the course of a protracted negotiation process," we have declaratory judgment jurisdiction.[32] Early Warning does not "have a right to bring the declaratory judgment action solely because their customers have been sued for direct infringement."[33]

We have the benefit of the reasoning in *Arris Group v. British Telecommunications PLC* and *Microsoft v. DataTern, Inc.* where the Court of Appeals for the Federal Circuit offered guidance on the jurisdiction of a district court to hear a declaratory judgment action brought by software suppliers in response to a patent infringement suit against their customers.

In *Arris*, a patent holding telecommunications company sent a letter to a competitor accusing the competitor of infringing patents.[34] The competitor sent a claim chart, which identified infringing elements provided by the competitor's supplier.[35] The competitor contacted its supplier,

informed it of the patentees' letter, and demanded the supplier, "defend, indemnify, and hold harmless [the competitor] from these assertions of infringement."[36] A few months later, the three companies held a meeting at the supplier's office.[37] The patentee made a 118-page presentation on its infringement contentions, and the supplier presented its case for non-infringement.[38] The supplier sent the patentee formal rebuttal information following the meeting.[39] The patentee then sent a proposed licensing agreement to the supplier and the competitor, but the parties did not execute the license agreement because it explicitly stated the license would be granted only to the competitor.[40] A year and two months after the supplier first became involved in the licensing negotiations, the supplier sued the patentee seeking a declaratory judgment of invalidity or non-infringement.[41]

The patentee moved to dismiss for lack of subject matter jurisdiction, arguing no case or controversy existed between the supplier and the patentee.[42] The Court of Appeals for the Federal Circuit found a case or controversy existed between the supplier and the patentee because the patentee impliedly accused the supplier of contributory infringement.[43] The court walked through each element of contributory infringement.[44] The court explained, "[t]o hold a component supplier liable for contributory infringement, a patent holder must show . . . : (a) the supplier's product was used to commit acts of direct infringement; (b) the product's use constituted a 'material part of the invention'; (c) the supplier knew its product was 'especially made or especially adapted for use in an infringement' of the patent and (d) the product is 'not a staple article or commodity o commerce suitable for substantial noninfringing use.'"[45]

The Court of Appeals for the Federal Circuit found the first element – direct infringement through use of the supplier's product – easily satisfied because the patentee accused the competitor of direct infringement.[46] The court then assessed the second element – whether the use of the

supplier's product constituted a "material part of the invention."[47] In analyzing this element, the court looked to the patentee's 118-page presentation of infringement contentions.[48] The court noted the presentation discussed the supplier's products on at least seventy-seven pages.[49] The court also noted the claim chart incorporated the supplier's product literature.[50] The court found the patentee's infringement presentation "made it clear that [the competitor's] use of the [supplier's products] was central to [the patentee's] infringement contentions" through its "extensive focus" on the use of the supplier's products in each element or asserted claim analyzed in its presentation.[51]

The court of appeals then analyzed the third and fourth elements – whether the supplier knew its products were designed specifically for an infringing use and whether the patents are "staple article[s] or commodit[ies] of commerce suitable for substantial noninfringing use."[52] The court explained the patentee alleged the supplier's product "were designed specifically" for an infringing use.[53]

The court of appeals, in going beyond the elements of contributory infringement, also "found it relevant [the supplier] was directly and substantially involved in [the patentee's] infringement and licensing negotiations."[54] The court explained, "[w]hile direct communication between the declaratory plaintiff and the patentee is not necessary to confer standing . . . , the nature and extent of any communications between the declaratory plaintiff and the patentee are certainly relevant factors to consider when evaluating whether there is an Article III controversy between the parties."[55]

The Court of Appeals for the Federal Circuit built off *Arris* three years later in *Microsoft Corp. v. DataTern*. In *Microsoft*, a litigious patent holder brought over 100 infringement actions in Texas against customers of two software supplier entities – SAP and Microsoft.[56] In response

to these lawsuits, SAP and Microsoft sued the patent holder in the Southern District of New York, seeking a declaration the patents were invalid or alternatively, their software products did not infringe the patents.[57] The patent holder moved to dismiss, arguing the district court lacked subject matter jurisdiction.[58] Judge Forrest denied the motion to dismiss, and the Court of Appeals for the Federal Circuit affirmed in part and reversed in part.[59]

The court of appeals outlined a few circumstances under which a supplier would have standing to bring a declaratory judgment action considering a suit against its customers. First, "[i]f [the supplier] had an obligation to indemnify their customers, they would then have standing to bring suit."[60] The court opined if a supplier has a duty "to indemnify a customer already sued by [a] patentee in Texas" it would not justify the supplier's seeking declaratory relief in the Southern District in New York.[61] The court explained, "[a]ppellees cannot seek a declaration from a New York court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues was *already* underway in a Texas court . . . By agreeing to indemnify any one of their customers, Microsoft could defend its customers and efficiently and effectively participate in *the Texas action*."[62]

Second, citing *Arris*, the court of appeals held "allegations by the patentee or other record evidence" establishing "at least a reasonable potential" the patentee could bring a contributory infringement action against the supplier confers the supplier with standing to bring a declaratory judgment action.[63] The court explained, "[t]o prove inducement of infringement, unlike direct infringement, the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced act constitute patent infringement."[64] It continued, "[a]bsent the knowledge and affirmative act of encouragement, no party could be charged with inducement."[65]

The court of appeals then discussed the type of allegations or record evidence sufficient to imply contributory infringement and confer standing on a supplier. It looked to the claim charts and found supplier-standing existed when the claim charts cite to supplier-provided instructions and documentation.[66] The court found "these claim charts can be read to allege [the supplier] is encouraging the exact use which [the patentee] asserts amount[s] to direct infringement."[67] But where the claim charts "cite exclusively to third party – not [supplier] provided – documentation for several key claim limitations" the claim charts do not "impliedly assert . . . Microsoft induced that infringement" even though the claim charts allege "the customers' direct infringement of the [asserted patent] based on its use of" the supplier's product.[68] The court reasoned, "simply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement," and the court's review of the record did not "uncover any evidence [the supplier's product] is not suitable for substantial non-infringing uses" or of the supplier's knowledge its product was "especially made or adapted for use in an infringement of" the asserted patents.[69]   Thus, the court held the allegations and evidence fell short of "suggest[ing] [the supplier] encouraged the acts accused or direct infringement.[70]

Third, the court of appeals recognized "a patentee's aggressive enforcement strategy, even in the absence of direct threats against the declaratory plaintiff, may also support jurisdiction."[71] But the court clarified where the patentee's "litigation strategy appears to involve suing software users, not software suppliers," "litigiousness against direct infringers alone" is not sufficient to create a substantial controversy between the patentee and the supplier.[72]

The Court of Appeals for the Federal Circuit limited its consideration of facts beyond the pleadings.  It explained "post-complaint facts" cannot confer declaratory judgment standing on a manufacturer if "none existed at the time of filing" the complaint.[73]   The court rejected the

argument the patentee's references the supplier's infringement in post-complaint filings and the patentees' refusal to grant the suppliers a covenant not to sue after filing the complaint did not give rise to a "case or controversy."[74]

The Court of Appeals for the Federal Circuit's decision in *Streck Inc. v. Research Diagnostic Systems, Inc.* further guides us on defining the scope of a case and controversy between a patentee and a potential infringer.[75]  In *Streck*, two companies tried to patent similar products around the same time, and the plaintiff filed its patent first.[76]  The defendant starting selling its products, and the plaintiff sued for infringement of the patents.[77]  In accord with the Patent Local Rules of Northern District of California, the plaintiff filed his infringement contentions setting forth "each claim of each patent in suit that is allegedly infringed" and the defendant filed its invalidity contentions.[78]  Plaintiff identified thirteen infringed claims.[79]  Plaintiff later narrowed his infringement contentions, and defendant broadened its invalidity contentions to include all patent claims.[80]  The defendant asserted a counterclaim alleging the entire patent was invalid.[81]  Judge Bataillon granted summary judgment on the counterclaims, finding the court did not have subject matter jurisdiction to declare the validity of patent claims not asserted by plaintiff.[82]  The Court of Appeals for the Federal Circuit affirmed, finding no "continuing case or controversy with respect to unasserted claims."[83]

Applying the principles articulated in *Arris, Microsoft*, and *Streck*, we must determine whether Early Warning has standing to bring a declaratory judgment action, and if it does, we must determine the proper scope of the Early Warning's standing. We find Early Warning has standing under *Microsoft* based on its obligation to indemnify Frost Bank in the Texas action.  But in light of the Court of Appeals for the Federal Circuit's instruction in *Microsoft* indemnifying suppliers must defend their rights in in the original action against their customers rather than bring a separate

suit in another district, we must dismiss the case unless we find a broader case and controversy beyond Early Warning's indemnification obligations. As we do not find a broader case and controversy beyond the indemnification obligations to Frost Bank, we grant Mr. Grecia's motion to dismiss.

A.   **While Early Warning's duty to indemnify Frost Bank creates a case or controversy between Mr. Grecia and Early Warning as an indemnitor, there is no case and controversy regarding Early Warning's infringement.**

Early Warning agreed to defend and indemnify Frost Bank for Mr. Grecia's suit against Frost Bank. As the Court of Appeals for the Federal Circuit made clear in *Microsoft*, a supplier with "an obligation to indemnify their customers" has "standing to bring suit."[84] But the court of appeals went on to clarify if a supplier has an obligation "to indemnify a customer already sued by the patentee in Texas . . . it would not justify" the supplier in seeking declaratory relief in another court.[85] The court explained a supplier "cannot seek a declaration from [another] court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues [is] *already* underway in a Texas court."[86] The court reasoned, "[b]y agreeing to indemnify any one of their customers, [a supplier] could defend its customers and efficiently and effectively participate in *the Texas action*."[87]

We follow the Court of Appeals for the Federal Circuit. Early Warning assumed the obligation to indemnify and defend Frost Bank – "a customer already sued by [Mr. Grecia]" in Texas. The Texas suit "was already underway" when Early Warning sued here two months after Mr. Grecia sued its indemnified customer in Texas, and the Texas suit involves the same patents and the same claimed products. As Early Warning has an obligation to indemnify Frost Bank against Mr. Grecia's claims, a case or controversy lies between Early Warning and Frost Bank.

But *Microsoft* instructs us Early Warning should litigate this controversy in connection with the first action.

> **B.      There is no case or controversy beyond Early Warning's indemnity obligations.**

Early Warning argues we should continue presiding over this case notwithstanding the language in *Microsoft* because the case and controversy between Early Warning and Mr. Grecia goes beyond Early Warning's indemnification obligations to Frost Bank. Early Warning urges us to look at the totality of the circumstances – including Mr. Grecia's threats and accusations against Early Warning, his litigious conduct, his refusal to provide a covenant not to sue, and his numerous judicial admissions – and find a case and controversy extending beyond Early Warning's role as indemnitor in the Frost Bank action. Mr. Grecia argues there is no case and controversy because he has no claims or potential claims directly against Early Warning. He further argues under *Streck*, our subject matter jurisdiction is limited to claims against Early Warning actually asserted in the Texas action. Relying upon Mr. Grecia's repeated representations to this Court of his lack of claim against Early Warning and mindful of the Court of Appeals' instruction in *Streck* to limit our declaratory subject matter jurisdiction to claims actually asserted by a patentee, we do not find a broader case and controversy than the one the parties are litigating in Texas.

We consider each of Early Warning's arguments as to why a broader case and controversy exists beyond the Frost Bank action in turn.

> **1.      Mr. Grecia's litigious conduct does not create a case and controversy beyond Early Warning's indemnity obligations.**

Early Warning argues we should continue presiding over this action because of Mr. Grecia's history of filing suit against Early Warning's customers. We disagree.

The Court of Appeals for the Federal Circuit in *Microsoft* addressed whether a patentee's litigious conduct creates a case and controversy. The court explained, "a patentee's aggressive enforcement strategy, even in the absence of direct threats against the declaratory plaintiff, may also support jurisdiction."[88] But the court clarified where the patentee's "litigation strategy appears to involve suing software users, not software suppliers," "litigiousness against direct infringers alone" is not sufficient to create a substantial controversy between the patentee and the supplier.[89]

Mr. Grecia's counsel explained his litigation strategy in no uncertain terms during oral argument. He did not hide the plan in lawyerly caveats. He explained Mr. Grecia believes himself precluded from bringing any claims for direct or indirect infringement against Early Warning. Relying on this admission, we do not find Mr. Grecia's litigious conduct creates a case and controversy.

## 2.    Mr. Grecia's threats and accusations against Early Warning do not create a case and controversy.

Early Warning argues we should exercise subject matter jurisdiction because Mr. Grecia's pre-suit demands and allegations establish a case and controversy regarding Early Warning's "potential liability for direct, induced or contributory infringement."[90] Relying on Mr. Grecia's admission he has no claims against Early Warning, we do not find Mr. Grecia accuses Early Warning of direct, induced, or contributory infringement.

As Early Warning correctly notes, the court of appeals in *Arris* makes clear we have subject matter jurisdiction over declaratory judgment actions brought by suppliers accused of induced or contributory infringement.[91] "To hold a component supplier liable for contributory infringement, a patent holder must show . . . : (a) the supplier's product was used to commit acts of direct infringement; (b) the product's use constituted a 'material part of the invention'; (c) the supplier knew its product was 'especially made or especially adapted for use in an infringement' of the

patent and (d) the product is 'not a staple article or commodity of commerce suitable for substantial noninfringing use.'"[92] "To prove inducement of infringement, unlike direct infringement, the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced act constitute patent infringement."[93] "Absent the knowledge and affirmative act of encouragement, no party could be charged with inducement."[94]

During oral argument, Mr. Grecia made clear he does not believe he has a claim, or will ever have a claim, against Early Warning for direct or indirect infringement relating to the '555 patent. He represented, "Early Warning should have comfort that, as far as patent infringement goes, it or its purported customers have nothing to worry about, because everything Mr. Grecia has in his patent portfolio would be directed towards entities with Applications that perhaps use components provided by parties like IBM, not Early Warning Services; provided by perhaps parties like Fiserv, not Early Warning Services."[95] He further represented, "It's [Mr. Grecia's] view that [he] has no direct or indirect patent infringement claims against Early Warning . . . because . . . an analysis of infringement does not implicate any services that Early Warning provides."[96] He later represented, "there are no Early Warning Services that implicate the infringement analysis."[97] He again represented, "we believe we're precluded from . . . making any allegation of direct or indirect infringement against Early Warning or any Early Warning customer that consumes Early Warning services."[98]

Relying on Mr. Grecia's long-time counsel's admissions, Mr. Grecia does not have, or has otherwise waived, any claims accusing Early Warning of any form of direct or indirect infringement involving the '555 patent.

### 3. Mr. Grecia's refusal to covenant not to sue and other post-complaint conduct does not create a case or controversy.

Early Warning cites Mr. Grecia's refusal to provide a covenant not to sue, Mr. Grecia's recent threats to file additional lawsuits, and several judicial admissions Mr. Grecia made in various filings in this action to argue there is a broader case and controversy than the Texas litigation. Under *Microsoft*, we find the covenant not to sue and Mr. Grecia's post-complaint conduct insufficient to create a case and controversy beyond Early Warning's indemnification obligations in Texas.

The Court of Appeals for the Federal Circuit in *Microsoft* explained "post-complaint facts" cannot confer declaratory judgment standing on a manufacturer if "none existed at the time of filing" the complaint.[99] The court rejected the argument the patentee's references to the supplier's infringement in post-complaint filings and the patentees' refusal to grant the suppliers a covenant not to sue after filing the complaint did not give rise to a "case or controversy."[100]

Like in *Microsoft*, Early Warning is attempting to rely on post-complaint facts to establish a broader case and controversy than the one underway in Texas. We will not find a broader case and controversy than the case and controversy Early Warning is defending in Texas.

## III.    Conclusion

While we find a case or controversy between Mr. Grecia and Early Warning in its capacity as an indemnitor of Frost Bank, we do not find a broader case and controversy regarding Early Warning's potential liability for infringement under a theory for which it has standing. We grant Mr. Grecia's motion to dismiss.

---

[1] The parties dispute whether the various entities Early Warning has indemnified over the years are "customers" of Early Warning or simply licensees of Early Warning's Zelle® trademark. By using the word "customer," we do not intend to take a position on this fact question.

[2] ECF Doc. No. 1 at 41.

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.* at 49-54.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Compl., *Grecia v. Frost Bank*, No. 21-16-ADA, ECF Doc. No. 1 (W.D. Tex. Jan. 8, 2021).

[14] Compl., *Frost Bank*, No. 21-16-ADA, ECF Doc. No. 1-3.

[15] ECF Doc. No. 1 ¶ 20.

[16] ECF Doc. No. 1.

[17] ECF Doc. No. 4.

[18] ECF Doc. No. 14.

[19] ECF Doc. No. 15.

[20] ECF Doc. Nos. 42, 43.

[21] ECF Doc. No. 70. Early Warning's counsel failed to mention *Microsoft* consistent with his duty of candor when it opposed Mr. Grecia's pro se motion to dismiss even though Early Warning's counsel also represented parties in *Microsoft.* Counsel apologized for his lack of candor explaining he never thought of *Microsoft* before reviewing Mr. Grecia's counseled Motion to dismiss is now before us where he properly raised *Microsoft.* We appreciate Early Warning's counsel's apology, but we expect counsel would have thought of the same issue they argued in *Microsoft* involving similar issues seven years ago. We decline to refer this lack of candor to disciplinary authorities with notice further disregard of the duty of candor to any member of this District Court may result in referral.

[22] ECF Doc. No. 72.

[23] *See, e.g.*, ECF Doc. No. 77 at 38:6-7 ('[W]e don't think we have a Claim against Early Warning. I mean, we don't think a Claim lies against Early Warning."); *id.*

[24] *Id.* at 46: 15-22.

[25] *Id.* at 47: 2-10.

[26] *Id.* at 47: 12-14.

[27] *Id.* at 51:8-12. At the close of oral argument, the parties agreed to try to resolve this action based on Attorney Wawryzn's repeated representations Mr. Grecia has no claim against Early Warning beyond their status as an indemnitor of bank customers. The parties later informed they failed to agree.

[28] *Arris Grp. v. British Telecomm'cs PLC*, 639 F.3d 1368, 1373 (Fed. Cir. 2011).

[29] *Microsoft Corp. v. DataTern, Inc*., 755 F.3d 899, 903 (Fed. Cir. 2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

[30] *Microsoft Corp.*, 755 F.3d at 903 (quoting *MedImmune, Inc.*, 549 U.S. at 127).

[31] *Id.* (emphasis in original).

[32] *Id.* (quoting *Arris*, 639 F.3d at 1381).

[33] *Id.* at 904.

[34] *Arris Grp.*, 639 F.3d at 1372.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 1372-73.

[40] *Id.* at 1373.

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.* at 1376.

[45] *Id.*

[46] *Id.*

[47] *Id.* at 1378.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Microsoft Corp.*, 755 F.3d at 902.

[57] *Id.*

[58] *Id.*

[59] *Id.* at 911-12.

[60] *Id.* at 904.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 905.

[64] *Id.* at 904.

[65] *Id.*

[66] *Id.* at 905-06.

[67] *Id.* at 905.

[68] *Id.*

[69] *Id.* at 906.

[70] *Id.* at 905.

[71] *Id.* at 906-07.

[72] *Id.*

[73] *Id.* at 906.

[74] *Id.*

[75] *Streck, Inc. v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269 (Fed. Cir. 2012).

[76] *Id.* at 1275-76.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 1276.

[80] *Id.*

[81] *Id.*

[82] *Id.* at 1281.

[83] *Id.* at 1284.

[84] *Microsoft*, 755 F.3d at 903.

[85] *Id.*

[86] *Id.*

[87] *Id.* at 904.

[88] *Id.* at 906.

[89] *Id.* at 906-07.

[90] ECF Doc. No. 74 at 8.

[91] *Id.* (citing *Arris*, 639 F.3d at 1375).

[92] *Arris*, 639 F.3d. at 1376.

[93] *Microsoft*, 755 F.3d at 904.

[94] *Id.*

[95] ECF Doc. No. 77 at 46: 15-22.

[96] *Id.* at 47: 2-10.

[97] *Id.* at 47: 12-14.

[98] *Id.* at 51:8-12.

[99] *Microsoft*, 755 F.3d at 906.

[100] *Id.*